## THE CONEY ISLAND.

(District Court, E. D. New York. December 28, 1901.)

TUG AND TOW—GROUNDING OF TOW—LIABILITY OF TUG.

Evidence considered, and *held* to sustain the defense of a tug that the grounding of a canalboat which she had in tow resulted from the misrepresentation made by the master of the canalboat as to the depth of water she drew; that the captain of the tug was not negligent in failing to discover before the final grounding that she drew more than was represented; and that the tug took her on a course where she would have floated with such draught as she was represented to have, and was not in fault for the grounding, nor in failing to return to the rescue of the canalboat before she was broken up through the further negligence of her master in casting off the lines by which the tug had made her fast to a dike.

In Admiralty. Suit in rem against a tug to recover for injury to a tow by grounding.

Hyland & Zabriskie, for libelant Nelson Zabriskie.

Alexander & Ash, for claimant Peter Alexander.

THOMAS, District Judge. This action involves injury to the canalboat Quinn through the alleged negligence of the steam tug Coney Island, in Coney Island Creek. The Quinn, a canalboat some 20 years old, and, although repaired fairly, yet unduly leaking at times, came across the bay from Perth Amboy, and was taken Thursday, January 25, 1900, by the tug for delivery at the coal yards of Smith & Son, some distance up Coney Island Creek. After grounding twice while entering Gravesend Bay, she crossed the bar upon an increasing tide, but by reason of the fog was anchored in deep water before reaching the entrance of the creek. Thereupon the tugboat left her, and did not return until Sunday, January 28th, during which time the Quinn's anchor had dragged and the anchor line parted, through contact with a fishing smack, but no apparent harm had resulted. The tug took the Quinn in tow on two short hawsers, and proceeded up the creek, until about 6 p. m., when the Quinn went aground at the locality where the injury was received. The tug, having made the Quinn fast by bow and stern lines extending to a breakwater on the easterly side of the creek, left, on account of shortage of water, promising to return the next morning, Monday, January 29th. The creek is narrow and winding, and navigable only, for a vessel of the Quinn's draught, when the tide is approaching high water. A westerly wind opposes and an easterly wind favors the flood tide, the difference in the rise on a westerly or easterly wind being some two feet. Monday, January 29th, the tug did not return, prevented by a strong westerly wind, which was prohibitory of her navigation. On Tuesday the conditions of the weather were favor-

able, but it was not until Thursday, February 1st, that the tugboat returned. Meanwhile, in the early morning of Monday the 29th, McMahon, captain of the Quinn, cast off her lines, with the intention of making some progress on his own account up the creek in the face of the adverse wind, under alleged but unproven order of the captain of the tug to do so. But this resulted only in some part of the boat swinging farther into the stream, what part will be considered later. On Tuesday, January 30th, the canalboat broke up on the noon tide to such an extent that she leaked badly, and became so firmly aground that she could not be moved by the Coney Island when she came to her assistance.

Several questions were presented to the court: (1) What representations did the captain of the Quinn make to Finnegan, the captain of the tug, respecting the Quinn's draught? (2) At what point in Coney Island Creek did the Quinn ground on Sunday, January 28th, while in tow of the tug? (3) Did she ground in the channel or out of the channel? (4) Was her final injury due in any part to the throwing off of the canalboat's line by her captain? (5) Was the tug negligent in failing to return earlier, and did the injury, in whole or in part, arise from such negligence?

The voyage undertaken was through waters so tortuous and abounding in shoals that an accurate knowledge of the draught of the vessel in tow was imperative. It is admitted that the captain of the tug asked McMahon, the captain of the Quinn, respecting the draught of the latter's vessel; and Finnegan, the captain of the tug, states that McMahon replied that her draught was six feet. McMahon himself states that he represented her draught to be 6 feet 4 or 5 inches.

The evidence shows very preponderatingly (1) that the bow was 25 feet or more from the dike; (2) that the stern could swing at any time before the lines were thrown off; (3) that the bow was at all times aground. First, observe from the evidence of the several witnesses the distance of the bow from the dike:

| Name. | Relation to Vessel. | Bow Out. | Stern Out. |
|---|---|---|---|
| Haynor, | Engineer of Tug. | 10 or 15 ft. | 5 ft. |
| Finnegan, (He says when he returned Thursday her bow was 60 ft. off.) | Captain " " | 5 " | 5 " |
| Rafferty, | Deckhand " " | 6 " | 5 " |
| Fountain, | Pilot of tug several times passing, on day of grounding and afterward. | 100 " | 8 or 10 " |
| McMahon, | Captain of Quinn. | 25 to 30 " | 5 to 12 " |
| Flannery, | Agent for " | 40 to 50 " | 5 " |
| Riley, | Sent to pump " | 30 " | 4 to 5 " |
| Hemminger, | Wrecker " | 20 to 25 " | 5 or 6 " |
| Taylor, | " " | 40 to 50 " | Stern against dike |
| Housell, | " " | (50 to 60 ") (40 to 50 ") | 6 or 8 ft. |

Now, mark the effect of these conclusions as bearing upon the selection of point A on Exhibit 2 as the place of grounding.

Twenty feet from the sheet piling at A the depth, based on measurements at intervals of 25 feet, is as follows, proceeding northerly from the exact spot marked "A" for the distance of 200 feet:

| Low water— | 4 | 6 | 2 | 2 | 2 | 2 | 3 | 2 | 1 | ft. |
|---|---|---|---|---|---|---|---|---|---|---|
| High " — | 9 | 11 | 7 | 7 | 7 | 7 | 8 | 7 | 6 | " |

The tide rises at least 5 feet, some witnesses state 5½ feet, and Cary 4 feet 8½ inches. Although Taylor, the wrecker, places her bow near A, yet if Cary's statement that the parties agreed on the place of grounding, 75 to 100 feet northerly thereof, there is no place where the Quinn could have gone aground at high water, as claimed, unless she drew over 6 feet and 5 inches, as will be seen by the following diagram copied from Cary's map and from his evidence, and, if the grounding be assumed farther south towards A, the result is less favorable to the libelant:

But now assume that she went aground, as contended by claimant, at a point 100 feet northerly of B. There the measurements, proceeding northerly along the dike, extending from a point 100 feet northerly of B for about 90 feet, are as follows:

115 F.—48

| | | | |
|---|---|---|---|
| Low water | 3 | 2½ | 2½ ft. |
| High " | 6 | 7½ | 7½ " |

Ten feet from dike:

| | | | |
|---|---|---|---|
| Low water | 3 | | " |
| High " | 6 | | " |

Twenty feet out:

| | | | |
|---|---|---|---|
| Low water | 2½ | 3 | 2½ " |
| High " | 7½ | 8 | 7½ " |

Thirty feet out:

| | | | |
|---|---|---|---|
| Low water | 2 | 2 | 2 " |
| High " | 7 | 7 | 7 " |

Forty feet out:

| | | | |
|---|---|---|---|
| Low water | 2 | 1 | 1 " |
| High " | 7 | 6 | 6 " |

If the Quinn grounded in this location, it is apparent that she drew more than 6 feet and 5 inches of water.

From this it appears that the Quinn could not have gone aground at A or B had she drawn no more water than represented by her captain. Therefore the conclusion is irresistible that her draught was misrepresented.

Did the tug carry the Quinn out of the channel? If the grounding was at A, the tug carried her eastward of the deepest water. It was not obligatory upon the tug to take the deepest water, but, rather, to use care to find sufficient depth. If the Quinn drew no more than represented, there was water enough where Cary took the soundings. It will be observed that McMahon testified that, when the tug was about leaving on Sunday afternoon, she backed up between the dike and the port side of the Quinn, and made the lines fast, and it appears that the tug drew 6 feet of water.

But did the captain of the tug have notice that the Quinn drew more than the represented draught, and was he negligent in not noticing the fact on account of the groundings that had happened previous to that time? In approaching Coney Island Creek, the Quinn grounded twice crossing the bar, but this was nothing unusual. In coming up the creek itself, the Quinn touched bottom at least twice, but this was explained by stating that the turns were so sharp that vessels at all times were likely to bring up a little in rounding turns. The most troublesome evidence upon this point is that of Finnegan himself, as follows: "After I left anchorage, when I see she was grounded so, I did have it in mind she was drawing more than six feet of water." But should he have observed that she was drawing over 6 feet 5 inches, or probably nearly 7 feet? In view of the undoubted fact that boats are constantly touching in this creek, or grounding for more or less time, especially in crossing bars and rounding turns, it is considered that the captain of the tug is not shown negligent in failing to notice and guard against the misrepresentation of McMahon.

Did the Quinn go aground at A or B? The decision of this point may be unnecessary, and presents some difficulties. It will be observed that at A there are at least 120 or more feet where the water

at high tide is from 10 to over 20 feet in depth. At the point above B the channel is about 40 or 45 feet wide, and runs along the dike. The following is a statement of the width of the channel by various witnesses at the trial:

Witnesses for libelant:

| Name. | Relation to the Vessels. | Distance. |
| --- | --- | --- |
| Flannery, | Agent for Quinn. | 30 to 40 ft. |
| Hemminger, | Wrecker. | (See statement below.) |
| Taylor, | " | 40 ft. |
| Riley, | Sent to pump Quinn. | 30 " |
| Housell, | Wrecker. | 30 " |

Witnesses for claimant:

| Fountain, | Pilot of tug, who saw Quinn the day she grounded, and passed around her bow several times afterwards, on the first occasion on Thursday. | 40 or 50 " |
| --- | --- | --- |
| Finnegan, | Captain of tug, | 35 to 40 " |

Hemminger states that his pump boat and the lighter could lie outside the Quinn, whose bow was lying right in the channel, and that a tug, but not a loaded boat, could go outside, and he states that the channel was wide enough for a tug and boat to go in there side by side. He says that the channel was practically obstructed. The evidence of Taylor, Housell, and Fountain is to the same effect, although Fountain says that her bow, judging by the length of the boat, was some 100 feet out. Fountain was doubtless confused, as he says she lay angling in the stream, and that he had to push her in to get by.

From this evidence there would be no trouble in concluding that the grounding was not at A, so far as the given width of the channel is concerned. The description fits better the point B. But if the Quinn's bow was 25 feet from the dike, and her breadth be added, a considerable part of the ascribed width of the channel would be taken up, and the pump boat and the lighter, each about 17 feet wide, would have difficulty in lying outside of the Quinn, although the pump boat drew only 4 feet, and the lighter loaded drew 6 feet or over. Fountain's evidence corroborates Finnegan, and this witness, in harmony with Finnegan, Flannery, McMahon, and Riley, states that at the place of grounding the channel extends from the dike to the meadow side.

This evidence as a whole leads to the conclusion that the grounding was not at A, but more probably at or above B. The evidence of what happened at Neptune avenue a few days after the trial has not been disregarded. Cary, the surveyor, Finnegan, McMahon, Flannery, and one of the wreckers, were there. Cary states that the wrecker, and not Flannery, indicated a point 75 to 100 feet north of A as the place of grounding; that Finnegan took no part in the discussion, but did not dissent. Finnegan states that Flannery pointed out the place, as the wrecker was unable to locate it, and that he

(Finnegan) indicated the place north of B, which Flannery disputed, contending that the true location was that north of A. There is a similar bend in the dike at A and B, and it does not appear with sufficient clearness that Finnegan agreed to A, as urged. The observers were about a thousand feet from A, and still farther from B, and the conflicting statements are too uncertain for valuable aid.

In the attempt to determine the true location of the grounding, difficulty has been caused by the evidence of Taylor, Housell, and Hemminger, wreckers, to the effect that the easterly line of the channel at the place of grounding was 50 feet from the dike, that the Quinn's bow was east of the east line of the channel, and that between the Quinn and the dike the space was largely sand at low water. All these witnesses saw and had to do with the Quinn several days after the grounding. Their evidence and that of other witnesses shows that the tide had much to do with the gathering of the sand on the port side of the wreck, although it appears from the evidence of the wreckers that for some 100 feet along the general locality of A there was sand, but no water. Cary's map shows that at A, and for 200 feet northerly thereof, there is from 1 to 4 feet of water 10 feet out from the dike at low water; 1 to 6 feet, 20 feet out; 2 to 6 feet, 30 feet out; and therefore the conditions of sand stated by the wreckers could not exist unless immediately along the dike. The conclusion is irresistible that the sandy appearance, as stated by the wreckers, in large part arose after the grounding, inasmuch as the distances of the bow from the shore, given by them, would have brought the boat into deep water at the point A, according to the Cary map.

The remaining question is, was the tug in fault in failing to return before Thursday? There was no occasion for her returning, unless it was before the Quinn broke up on Tuesday. If the tug had been there on Monday she might have done some good, but the westerly wind prevented. What happened Tuesday? In this connection it should be observed that it has been found already that the Quinn grounded through the misstatement of her captain, upon which the captain of the tug relied, and had a right to rely. Therefore she came into the difficulties that existed through her own fault, and the obligation of the tug to tow her did not primarily demand that the tug should relieve the canalboat from the position in which her own fault had brought her. But, passing this, the line was let go early Monday morning, as McMahon states, and she broke up on the Tuesday noon tide. It is possible that the tug might have been of some aid, but the evidence tends to show very strongly that after the line was thrown off she became so firmly aground that the tug could not have helped her. Indeed, it is difficult to conclude that her bow did not go somewhat to starboard after the first grounding; for Taylor, Housell, Flannery, and Fountain place her bow so far out that it is difficult to harmonize the location of the bow given by them with the evidence of her position when the grounding happened.

After a careful reading and study of all the evidence that has been taken, the following conclusions are reached: (1) The Quinn could not have grounded at either A or B unless she drew more than 6 feet and 5 inches of water. (2) The captain of the tug took her over

a course where she could have floated with such draught as she was represented to have. (3) The captain of the tug was not negligent in failing to infer from his experience preceding the final grounding that the Quinn drew more than the represented draught. (4) The width of the channel is indicated by all the witnesses who saw the Quinn aground, either at about the date of the grounding or when the wreckers were there, makes it more probable that the grounding was somewhat north of B than north of A. (5) The distance of the bow from the dike, when the wreckers saw the Quinn, indicates that her bow swung somewhat to starboard after McMahon threw off the line. (6) As the grounding was primarily due to McMahon's misrepresentation and throwing off the line, the contract to tow did not require the tug to rescue the Quinn from the position in which the misconduct and misrepresentation of the Quinn's captain had brought her. (7) Even had the tug returned Tuesday, after the throwing off of the line in the early morning, the tug could not have rescued the Quinn from the position where the injury occurred. (8) The condition of sand observed to the port of the Quinn in greater part arose during the several days following the grounding, by the action of the tide.

The foregoing conclusions have not been reached without great difficulty, and are lacking in that certainty which is desirable in judicial decision, but seem to the court, upon the whole evidence, to be the more justifiable.

The libel should be dismissed, with costs.