## THE RAYMOND.

### (District Court, E. D. New York. April 15, 1910.)

TOWAGE (§ 11*)—INJURY TO TOW—NEGLIGENCE OF TUG.

A tug undertook to tow an old car float, then having a deck load of coal on board, from Barren Island, in Jamaica Bay, to a point on the northerly side of the bay, over shallows and through twisting channels, which could only be navigated at or near high tide. The towage was undertaken on the assumption, apparently based on statements of her master, that the draft of the float was not more than 5½ feet; but she grounded in a greater depth of water, and was left temporarily by the tug where she was injured by a storm, and after being towed to her destination later was found to be so seriously damaged, with her seams opened and timbers twisted, as to be beyond repair. Held, on the evidence, that there was no fault on the part of the tug which rendered it liable; the grounding of the tow being due to the fact that her draft, as laden, which could not be ascertained by the master of the tug, was greater than supposed, and her injury to her age and weakness.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Admiralty. Suit by Chester A. Dady against the steam tug Raymond and owners. Decree for respondents.

Robinson & Robinson, for libelant.
Alexander & Ash, for claimant.

CHATFIELD, District Judge. The libelant is the owner of a boat, formerly used as a railroad float, which the tugboat Raymond undertook to tow from Barren Island, in Jamaica Bay, to a point near the northerly side of the bay, over shallows and through twisting channels, such that the operation could not be performed except at or near high tide. This particular car float, which was many years old, is shown by the testimony of the libelant's witness Gokey to have been fitted up for a tender, or to assist in the operations of a dredge, and, while no repairs were put upon her hull, she was in such a condition that, under ordinary usage, Mr. Gokey's opinion was that she would not leak to any extent. On the other hand, Mr. Bushey, who had examined the barge some time previously for a purchaser, formed the opinion that she was so old that any strain, such as carting a deck load of coal, would open her seams and start her to leak within a comparatively short period.

On the day in question, as the tug Raymond came alongside, some discussion was had between the captain of the float, the captain of the tug, and some one on the boat which brought the float to Barren Island, as to the draft of the barge and the condition of tide. The captain of the float testified that the captain of the tug made his own examination and determined the draft at that time. This is denied by the captain and other men upon the tug, who are corroborated by evidence as to the construction of the float itself, which was rounded so that the draft could not be ascertained by means of a boat hook. The towing operation was apparently undertaken upon the assumption that the float was drawing not more than 5½ feet of water, which draft would probably have allowed her to reach her destination, even taking into account the twisting of the channel and the length of the boats, some 215 feet.

On the way up, a number of miles from Barren Island, and at a point where the channels had become mere streams running between mud banks at low tide, and hence with a depth of not more than 6 feet (the rise of the tide) over the flats, the float grounded. The captain of the float is of the opinion that the tug was aground also; but the testimony of all the witnesses of the tug is to the effect that she worked around the float and ultimately got her off. The recollection of the captain that she was kedged off by means of a small skiff anchor is so unlikely as not to be persuasive, and is probably the result of faulty recollection as to some occurrence not of the nature indicated by his testimony. At any rate, the float was released from its position; but again, owing to her length, and the fact that her draft then exceeded the estimated amount, she took bottom some distance from her destination. As the tide was then about to fall, and as the float had no anchors or other means for protecting herself in the channel, the captain of the tug did the only thing that was possible under the circumstances, and placed the scow upon the mud flats as

far as possible, having in the meantime sent the boat ashore to see if an anchor could be obtained, and having consulted with the captain of the float as to what should be done.

Testimony is given as to several attempts to release the float from her position on subsequent days, and ultimately, after lightering a part of the cargo, she was taken to her destination at high tide, there placed upon the mud, and since that has been in one position, with her seams opened and her timbers twisted to such an extent that it was impossible to attempt her restoration. It also appears that while she was lying upon the mud a severe storm caused some swell or unusual rise of the tide, and that a part of the deck load of coal was washed off. It is impossible to tell how much was actually lost in this manner, but the quantity must have been considerable; and if the handling of the float had been such as to impute negligence in towing, it would be necessary to consider whether the tug had done all that it should do in attempting to protect its tow after the stranding had occurred, and whether the tug or the owner of the coal was at fault in assuming that the vessel and its cargo could be safely allowed to remain at the point in question, it being evident that there was nothing to suggest a storm or any unusual danger on the night when the scow was put upon the flats.

But, looking at the whole situation, and considering the testimony of the witnesses and their recollection of the occurrences, it must be held that the tug and its crew did nothing for which they could be held responsible, unless there was negligence in attempting to take the barge to the point in question, under the conditions which could have been ascertained at the time the tug went to the float at Barren Island. The difficulties of the channel, the depth of water, and the space around the various turns, as well as the length and width of the float, were known to the tug captain. He also was bound to estimate the strength of the tide and the length of time within which he could safely undertake such an operation; and if the accident had resulted from any of these causes, or from careless handling of the float during the trip, the tug would be liable.

But the libelant does not meet the burden of proof in showing that the trouble came from any of these causes. It would appear, rather, that the float, in its loaded condition, even if not leaking at the time it left Barren Island, must have drawn considerably more than the amount estimated by her captain; and the fact that, when the float first grounded, the tug was able to proceed entirely around her, the tug then drawing 6½ feet of water, would indicate that the barge must have settled out of shape or have leaked to an extent sufficient to cause her to have acquired a draft much greater than had been estimated; and her lack of pumps or any facilities to keep her dry, as well as the impossibility of preventing sagging, due to her age and lack of strength, cannot be charged as a fault against the tug. When placed upon the mud, the diagonal strain of her position, and also from the deck load of coal, is sufficient cause for opening her seams and twisting her timbers, and of course this was aggravated greatly by the storm occurring some two days after.

Under the circumstances, it does not seem that the libelant has shown negligence on the part of the tug, and the libel should be dismissed.