## THE MEXPET.

## VACUUM OIL CO. v. MEXICAN PETROLEUM CORPORATION et al.

(Circuit Court of Appeals, Second Circuit. March 19, 1923. Rehearing Denied April 2, 1923.)

### No. 166.

Towage &⟶11(5)—Tugs held not liable for stranding of steamer which was of greater draft than represented.

Tugs employed to shift a steamer on representation that her draft did not exceed 24 feet, whereas, as loaded, it was considerably more, *held* not liable for her stranding, where, in the waters where she was required to be moved, and in the state of the tide, it was dangerous to move a vessel of over 24 feet draft, and the work would not have been undertaken had the towing company or masters of the tugs been correctly informed as to her draft.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by the Vacuum Oil Company, owner of the tank steamship Gargoyle, against the steam tugs Mexpet, Dalzelline, C. P. Raymond, and W. A. Gove. . Decree for libelant, and claimants of the tugs appeal. Reversed.

Appeal by the owner of the steam tug Mexpet and the managing owner, in behalf of the owners of the steam tugs Dalzelline, C. P. Raymond, and W. A. Gove, from a final decree of the District Court for the Southern District of New York, March 25, 1922. The decree awarding damages to libelant was a decree in rem against the four tugs, which were towing libelant's steamer at the time she stranded.

A libel was filed by Vacuum Oil Company, owner of the tank steamship Gargoyle, against the four steam tugs, supra, in rem only, to recover for damages sustained by the Gargoyle resulting from stranding while in tow of these tugs, off St. George, Staten Island, on the afternoon of February 24, 1917. The action was tried on May 28, 1920. At the conclusion of the trial an adjournment was taken to afford the court an opportunity to read the depositions, and on December 31, 1920, counsel appeared before the court and argued the case. On January 11, 1921, the court rendered its decision, allowing a decree for libelant in rem against all four tugs.

The District Judge very frankly stated in his·opinion that he had forgotten the impression made on him by certain of the important witnesses. The Gargoyle was a tank steamer 363.8 feet long. She was towed without her own steam in waters where, according to the testimony, it was obviously dangerous to tow such a vessel, if her draft was upwards of 24 feet. The testimony is also convincing upon the point that the stranding would not have occurred, if the draft had been but 24 feet.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for appellant tugs Mexpet, Dalzelline, and C. P. Raymond.

Foley & Martin, of New York City (George V. A. McCloskey, of New York City, of counsel), for appellant Brooks.

Barry, Wainwright, Thacher & Symmers, of New York City (John C. Prizer, of New York City, of counsel), for appellee.

. Before HOUGH, MANTON, and MAYER, Circuit Judges.

&⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes .

(288 F.)

MAYER, Circuit Judge (after stating the facts as above). At the threshold of the case is a question of fact, which controls its determination. On February 24, 1917, the Gargoyle was lying at Pier 5, Bayonne, N. J., and, on the morning of that day, Ernst Smith, manager of the steamship department of libelant telephoned to "Dalzell's" (Fred Dalzell & Co., Inc.), tugboat owners and operators, in regard to taking the Gargoyle from Pier 5 to an anchorage off Tompkinsville, Staten Island. While Ernst Smith did not remember with whom he spoke, the conversation, as testified to on direct, was as follows:

"I asked when they could take the vessel out. Discussion was had as to the tides, as is usual in such cases, and it was settled on that she was to go out at that hour, which was low water slack. There was an objection on the part of the towboat company to taking her out at low water, which they waived, and did take her. I do not know that I can tell you anything more. They asked if she had steam. They always ask that. They wanted to know about the number of boats.

"Q. Did you give them the draft of the vessel at that time? A. No; I didn't know it at that time.

"Q. Did you purport to give it, without knowing? A. I may have told it approximately; what it generally was loaded.

"Q. If you told them so, what did you tell them? A. As I recall it, I told them that the usual loaded draft was in the neighborhood of 28 feet."

On cross-examination, the testimony of Ernst Smith is disclosed in the questions and answers following:

"Q. Do you remember that, when you called up Dalzell & Co. they said that the time to take her out was 10 the following morning, on the high tide? A. Very likely. I do not recall that exact circumstance; very possibly they did; it was their custom to take her out on high water.

"Q. Was she always taken out at high water before? A. Usually; I can't say always, but usually.

"Q. Do you ever remember her going out at any other time? A. Oh, yes.

"Q. When was that? A. I have not any record of that, sir.

"Q. They did object to taking her out at low tide? A. Yes.

"Q. And you do not remember just what the other conversation was? A. No; I have stated all that I recall.

"Q. You do not recall exactly what the words used between you and that man were? A. No; it was three years ago."

It appears that the "Dalzell's" had shifted the Gargoyle on a number of previous occasions, but always at high water.

Opposed to the foregoing somewhat hazy recollection is the testimony of Robert Aikman, secretary and manager of "Dalzell's." He testified that the talk over the telephone was between Ernst Smith and himself. He said:

"A. We had docked her the day before, I think it was. Mr. Smith called up on the morning of the 24th and asked when we could take the ship out. I do not know the exact time, but it was in the afternoon. I asked if she was loaded, and he said, 'Yes.' I told him we would take her out at high water next morning, which would be 10 or 10:30. He said, 'No;' that she must get out that afternoon, that day. I asked him how much water she drew. I told him that it would be low water that afternoon. He told me she would not draw over 24 feet. I told him, if he was sure she would not draw over 24 feet, we could take her out in low-water slack.

"Q. Did he say anything else? A. He said she must get out that day, and I repeated again that, if he was sure she did not draw over 24 it was safe to take her out on the low water slack but if she drew more than that it wasn't safe.

"Q. And later you transmitted orders to take her out? A. The orders he gave to take her out that afternoon.

"Q. Was there any one in the office at the time? A. There was one of the captains. I took the question up with him about taking her out at low water.

"Q. Who was that? A. Capt. Rex of the Mexpet."

Capt. Rex corroborated Aikman to the extent of what Aikman said over the telephone. We have extracted the testimony rather fully, because it discloses that the agreement with Dalzell & Co. to undertake the towing operation was in accordance with usual practice known to those familiar with cases of this character. These transactions are generally conducted informally over the telephone. In a busy harbor, there is no time for formal documents, particularly where the parties, as here, have had previous transactions.

The testimony of Aikman sets forth just the kind of a conversation which would be expected in the circumstances. It is definite and to the point and Aikman was constantly dealing with the hiring of the tugs of his company. He, of course, must have realized that, when he agreed to shift the Gargoyle, the responsibility within legal limits would be upon the tug company or its tugs. It would therefore be natural that Aikman should be precise in ascertaining the draft. On the other hand, with Ernst Smith, such a transaction was only occasional. As contrasted with Aikman's testimony, it will be observed that Smith said that he did not know at that time what was the draft of the vessel, and that he may have told it approximately—what it generally was when loaded. He was then asked, not, "What did you tell them?" but, "If you told them so, what did you tell them?" When, therefore, be answered, "As I recall it, I told them that the usual loaded draft was in the neighborhood of 28 feet," such an answer, in the circumstances, was of little or no value.

We might very well rest here in concluding that the representation was as testified to by Aikman; but much is made of the contention that Capt. Bennett of the Dalzelline, who was in charge of the operation, knew or believed that the draft was 28 feet, instead of 24 feet, and was informed as to the true draft. Bennett was one of the Dalzell captains and he was on the Dalzelline at Atlantic Dock, when his office telephoned the order to him to shift the Gargoyle, drawing 24 feet. Bennett went to the Battery, where he picked up Capt. Oscar Smith, master of the Gargoyle, and Ernst Smith.

The record discloses that Bennett was a thoroughly experienced tugboat master. It is almost inconceivable that, with his knowledge of the local waters, he would have undertaken to tow the Gargoyle, if she drew 28 feet. In point of fact, he practically protested against doing the shifting. It is argued that this indicated that he realized that she drew more than 24 feet. But, even if she drew 27 feet 6 inches or 28 feet the undertaking involved potential danger as must be apparent to any one familiar with the waters around Bayonne, which, according to the testimony, were very black from oil, and also apparent to any one familiar with the chart so far as concerns navigation through the Kills in these parts.

On December 13, 1917, Oscar Smith testified by deposition that the Gargoyle bore a 28-foot draft mark, which must have been visible. On the trial on May 28, 1920, he contradicted his deposition, in such substantial and vital respects, that his whole testimony must be disregarded, and, while the recollection of his testimony was somewhat vague in the mind of the District Judge, it had, at least, left upon him an impression of unreliability.  In brief, the testimony is convincing that the Gargoyle did not bear any draft mark above the mark "XXVII," and that Bennett was not informed as to the correct draft.

If Capt. Bennett had no instructions from his owners, in respect of the draft of the Gargoyle, then, of course, he would have been guilty of negligence from the outset in failing to make appropriate inquiry in respect of the draft.  Capt. Bennett's testimony impresses us as truthful, and we think it appears that he is too experienced a master to have undertaken the appointed task without reliance upon the information conveyed to him by the owners.  This brings the matter back to the conversation between Ernst Smith and Aikman, which was at the base of the arrangement to do the shifting of the Gargoyle.

In our opinion, the testimony compels the conclusion that it was represented to Aikman that the draft was 24 feet.  Thus the case is brought within The Royal (D. C.) 138 Fed. 416, and The C. P. Raymond (D. C.) 178 Fed. 848, which we think correctly state the law, so far as here relevant.  See, also, The Coney Island (D. C.) 115 Fed. 751.

The decree is reversed, with costs, and the District Court is instructed to dismiss the libel, with costs.